Ronald J. Schutz (rjschutz@rkmc.com)
Ronald M. Daignault (rmdaignault@rkmc.com)
David Leichtman (dleichtman@rkmc.com)

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
601 Lexington Avenue, Suite 3400
New York, New York 10022
(212) 980-7400
Attorneys for Plaintiff Tahir Mahmood

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

12 CIV 0899

Tahir Mahmood,

Plaintiff,

v.

Research In Motion Ltd.,

Defendant.

CIVIL ACTION NO.

**JURY TRIAL DEMANDED**

RECEIVED FEB 03 2012 U.S.D.C. S.D. N.Y. CASHIERS

## COMPLAINT

Plaintiff Tahir Mahmood ("Mr. Mahmood") for his Complaint against defendant Research In Motion Ltd. ("RIM"), by and through his undersigned attorneys, alleges as follows:

## NATURE OF THE ACTION

1. This is a correction-of-inventorship action arising under the patent laws of the United States, 35 U.S.C. § 256, and New York state claims for fraud, conversion, unfair competition, unjust enrichment, breach of fiduciary duty, and declaration of ownership of

intellectual property based on Mr. Mahmood's communications, interactions and work with RIM regarding the conception and reduction to practice of a software solution for redirecting and pushing email from a host computer system to a mobile communication device such that a person could respond to an email message in a transparent manner using the same address as the one associated with the host system; for updating or synchronizing information between a host system and a mobile device allowing for a message status change indicator on a mobile device to be viewable on the computer; for mirroring data items between a host system and a mobile communication device; and for replicating data items in real time between a host system and a mobile communication device. Mr. Mahmood named his software solution "PageMail."

2. Unbeknownst to Mr. Mahmood, RIM co-opted Mr. Mahmood's inventions and, without naming Mr. Mahmood as the inventor, went on to file Patent Application No. 09/087,623, which issued as U.S. Patent No. 6,219,694 B1, entitled "System as Method for Pushing Information from a Host System to a Mobile Data Communication Device Having a Shared Electronic Address" ("the '694 patent") and the following related patents: U.S. Patent No. 7,386,588 B2, entitled "System and Method For Pushing Information From a Host System to a Mobile Data Communication Device" ("the '588 patent"); U.S. Patent No. 6,463,464 B1, entitled "System and Method for Replicating Information Between a Host System to a Mobile Communication Device Via a Wireless Network" ("the '464 patent"); and U.S. Patent No. 6,389,457 B2, entitled "System and Method for Pushing Information From a Host System to a Mobile Data Communication Device; U.S. Patent Application Publication No. 2008/0052365 A1, entitled "System and Method for Pushing Information From a Host System to a Mobile Data Communication Device" ("the '365 publication"); and U.S. Patent Application

Publication No. 2008/0052409 A1, entitled "System and Method for Pushing Information From a Host System to a Mobile Data Communication Device" ("the '409 publication"). Copies of the '588 patent, '464 patent, '457 patent, '365 publication, and '409 publication are attached as Exhibits 1, 2, 3, 4, and 5 respectively, and presently amended copies of the '365 and '409 publications' claims are included.

3. During the prosecution of Patent Application No. 09/087,623, the patent examiner stated that transparency, which Mr. Mahmood conceived and reduced to practice in PageMail, was the sole reason for allowing Patent Application No. 09/087,623 to issue as the '694 patent. The following was the examiner's statement of reasons for allowance:

> The prior art of record fails to disclose or render obvious a mobile device and message redirection system wherein messages received at the host system from the mobile device are configured using the address associated with the host system as the originationg (sic) address, and wherein messages generated at either the mobile data communication device or the host system share the first address, as claimed in the independent claims.

U.S. Patent Application No. 09/087,623 File History, Dec. 15, 2000, Paper 19 at 2.

4. From Patent Application No. 09/087,623, which issued as the '694 patent, RIM has been able to build a valuable and extensive patent portfolio that includes at least nineteen issued patents, including the '588, '464, and '457 patents. RIM continues to prosecute additional patent applications related to the '694 patent, including at least fourteen pending patent applications, including the applications underlying the '365 and '409 publications.

5. The application that issued as the '694 patent is the parent application to at least the following patents and patent applications:

| Patent No. | Relation to '694 Patent | Issue Date |
|---|---|---|

| | | |
|---|---|---|
| Patent No. 6,389,457 | Continuation | May 14, 2002 |
| Patent No. 6,401,113 | Division | June 4, 2002 |
| Patent No. 6,438,585 | Continuation-in-part | Aug. 20, 2002 |
| Patent No. 6,463,463 | Continuation-in-part | Oct. 8, 2002 |
| Patent No. 6,463,464 | Continuation | Oct. 8, 2002 |
| Patent No. 6,701,378 | Continuation-in-part | Mar. 2, 2004 |
| Patent No. 6,779,019 | Continuation-in-part | Aug. 17, 2004 |
| Patent No. 6,941,349 | Continuation of Patent No. 6,463,463 | Sept. 6, 2005 |
| Patent No. 7,209,949 | Continuation-in-part of Patent No. 6,779,019 | Apr. 24, 2007 |
| Patent No. 7,209,955 | Continuation-in-part | Apr. 24, 2007 |
| Patent No. 7,266,365 | Division of App. No. 09/829,178 | Sept. 4, 2007 |
| Patent No. 7,386,588 | Continuation-in-part | June 10, 2008 |
| Patent No. 7,509,376 | Continuation of Patent No. 6,779,019 | Mar. 24, 2009 |
| Patent No. 7,606,936 | Continuation-in-part of Patent No. 6,389,457 | Oct. 20, 2009 |
| Patent No. 7,685,244 | Continuation of App No. 13/043,903 | Mar. 23, 2010 |
| Patent No. 7,689,721 | Continuation of Patent No. 7,386,588 | Mar. 30, 2010 |
| Patent No. 7,953,802 | Continuation-in-part of Patent No. 6,779,019 | May 31, 2011 |
| Patent No. 8,050,661 | Continuation of Patent No. 7,953,802 | Nov. 1, 2011 |
| Patent No. 8,060,564 | Continuation of Patent No. 6,779,019 | Nov. 15, 2011 |

| Patent Application No. | Relation to '694 Patent | Filed Date |
|---|---|---|
| App. No. 09/782,107 | Continuation | Feb. 13, 2001 |
| App. No. 09/782,412 | Division of Patent No. 6,463,464 | Feb. 13, 2001 |
| App. No. 09/783,726 | Division | Feb. 14, 2001 |
| App. No. 10/240,945 | Continuation-in-part of Abandoned App. No. 09/545,962 | Apr. 10, 2001 |
| App. No. 09/928,983 | Continuation-in-part of Patent No. 6,701,378 | Aug. 13, 2001 |
| App. No. 10/207,418 | Continuation of Patent No. 6,463,464 | July 29, 2002 |
| App. No. 10/240,945 | Continuation-in-part of Patent No. 8,060,564 | Jan. 29, 2003 |

| | | |
|---|---|---|
| App. No. 11/925,770 | Continuation of Abandoned App. No. 10/671,162 | Oct. 27, 2007 |
| App. No. 11/925,811 | Continuation of App. No. 11/789,670 | Oct. 27, 2007 |
| App. No. 11/925,833 | Continuation of Patent No. 6,389,457 | Oct. 27, 2007 |
| App. No. 11/926,283 | Continuation of Patent No. 7,386,588 | Oct. 29, 2007 |
| App. No. 11/926,394 | Continuation of Abandoned App. No. 11/926,370 | Oct. 29, 2007 |
| App. No. 13/043,903 | Continuation of Patent No. 7,953,802 | Mar. 9, 2011 |
| App. No. 13/301,362 | Application not publicly available | Nov. 21, 2011 |

6. As recently as of June 2011, Defendant RIM attempted to secure allowance of a patent claim in Patent Application No. 09/782,412, which is a divisional of the application that underlies the '464 patent, by adding the transparency element that Mr. Mahmood conceived of, reduced to practice, and communicated to RIM.

7. RIM never informed Mr. Mahmood that RIM would be filing patent applications, including those that relate to the '694 patent, that disclosed and claimed subject matter that Mr. Mahmood had conceived of and developed on his own, and had communicated to RIM in confidence.

8. Mr. Mahmood previously filed a related action, *Mahmood v. Research In Motion, Ltd.*, Case No. 11-cv-05345-KFB-THK, regarding the '694 patent in this Court on August 1, 2011 ("the '694 patent action").

9. This action seeks to correct the wrongs committed by RIM and provide Mr. Mahmood with the equitable and monetary remedies he seeks with respect to the '588, '464, and '457 patents and the family of patents and patent applications related to the '694 patent, including the applications underlying the '365 and '409 publications. Mr. Mahmood also

seeks an injunction requiring RIM to include Mr. Mahmood in the prosecution of the applications underlying the '365 and '409 publications, and not to prosecute those applications to the detriment of Mr. Mahmood's inventorship and ownership rights.

## JURISDICTION AND VENUE

10. This action arises under the patent laws of the United States, Title 35 of the United States Code, including 35 U.S.C. § 256.

11. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338.

12. This Court has personal jurisdiction over RIM pursuant to New York C.P.L.R. § 302.

13. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(c).

## THE PARTIES

14. Plaintiff Mr. Tahir Mahmood is an individual and a citizen of the United Kingdom currently residing at 210, The Quadrangle, 1 Lower Ormond Street, Manchester, M1 5QE, United Kingdom.

15. Upon information and belief, Defendant RIM is a Canadian corporation having its principal place of business at 295 Phillip Street, Waterloo, Canada N2L 3W8.

16. Upon information and belief, Defendant RIM has transacted business in this Judicial District, including selling and offering to sell handheld communication devices, marketed as "BlackBerry" devices, into this Judicial District.

## BACKGROUND

### Mr. Mahmood's PageMail System

17. After working at Microsoft and Syncordia, Mr. Mahmood started his own

company, Synectics (U.K.), Ltd., in 1993, where he worked toward achieving his mobile, transparent, push email solution.

18. In 1994, based on an introduction from Bass Brewers Plc with whom he had done some consulting, Mr. Mahmood began working with Psion, PLC to develop an email client for its Series 3a handheld device. Mr. Mahmood created a prototype email gateway that allowed users to remotely dial-in using a modem to download emails to their handheld device.

19. At the same time, Mr. Mahmood was also working with Microsoft Mail's Out-of-Office Responder, which gave users the ability to forward emails to another email address, facsimile, or printer whenever they were away from their primary computer.

20. In that regard, Mr. Mahmood developed a product called "Mail Daemon," which was a software product that ran in the system background to forward email messages to another email address or facsimile gateway or to Mr. Mahmood's Pager Daemon program.

21. Mr. Mahmood's Mail Daemon was a software solution that forwarded email to the user, for example, by fax. But Mail Daemon could not process reply messages sent from the mobile device because the mobile devices were only "one-way."

22. Mr. Mahmood developed Mail Daemon in or about December, 1994 to compete with MSL Absentee Manager, which was able to forward e-mail to a user. Mail Daemon provided MSL Absentee Manager's functionality using more sophisticated MAPI software.

23. Mr. Mahmood expanded on Mail Daemon's capability, allowing email to be pushed to pagers and created a product called "Pager Daemon."

24. Thereafter, in early 1995, Mr. Mahmood met several times with Jeremy S. Button, a Project Manager at RAM Mobile Data ("RAM"), and Peter Philip, RAM's Email Product Manager. *See* Exhibit 6, January 30, 1995 Facsimile from Mr. Button to Mr. Mahmood; Exhibit 7, February 26, 1995 Letter from Mr. Philip to Mr. Mahmood.

25. At that time, in 1994 and 1995, RAM Mobile Data was in the business of selling "air time," primarily in the logistics market (tracking deliveries). RAM Mobile Data did not develop applications, and so needed to work with developers like Mr. Mahmood to create software and devices that could use RAM Mobile Data's air time.

26. At those meetings with Mr. Button and Mr. Philip, RAM agreed that if Synectics could develop, certify, and test a transparent pager/email gateway, RAM would help market Synectics' product. *See* Exhibit 8, February 26, 1995 Initial Product Specification.

27. RAM suggested that Mr. Mahmood design his email gateway for use with the Motorola InfoTAC, a handheld device that was certified to operate on RAM's Mobitex network and that provided two-way capability.

28. Mr. Mahmood's product, which was later named "PageMail," was an email gateway designed to deliver messages between an email server and the InfoTAC mobile data communication device. PageMail ran on the host system and actively redirected and pushed emails to the InfoTAC device upon a number of user-defined events.

29. Once activated, PageMail achieved uninterrupted, real-time email redirection by continually querying the user's email account on their behalf using their credentials and pushing an email from a message-sender to the InfoTAC device as the email arrived.

30. PageMail was capable of receiving and redirecting messages sent from a

plurality of message senders.

31. The InfoTAC device was also capable of creating response messages. Once a response message was selected, the InfoTAC device would then transmit the message back to the host system.

32. At the host system, PageMail would then receive the response message from the InfoTAC device and combine the response message with the re-directed message to which the InfoTAC user was replying.

33. Next, PageMail would use the user's originating email address associated with the host system to send the combined message to the message-sender.

34. Because PageMail used the user's originating email address and credentials, the response appeared as if it were generated at the host system.

35. More specifically, the response message that PageMail generated appeared to the message-sender to have the same "from" messaging-address as a message generated at the host system.

36. PageMail was also capable of synchronizing information between the mobile device and host system. For example, if a message had been read on a mobile device, there would be an indication that the message had already been read when viewing the message on the host computer.

37. PageMail was also capable of mirroring data items between a host system and mobile device as well as replicating data items in real time between a host system and a mobile device.

38. By around May 1995, Mr. Mahmood had demonstrated a functioning product to RAM, which was named "PageMail" in preparation for its release. *See* Exhibit 9, PageMail

brochure.

39. On August 31, 1995, RAM put PageMail through its pre-certification test, and on September 8, 1995, PageMail was officially certified for use on the RAM Mobitex network.

40. Shortly thereafter, RAM organized a confidential, consumer focus group to evaluate Mr. Mahmood's PageMail product on Motorola's InfoTAC handheld device.

41. Although the focus-group participants enjoyed PageMail's functionality, the participants disliked the Motorola InfoTAC because of its size, weight, and lack of a QWERTY keyboard.

42. As a result of this focus group study, Mr. Mahmood and RAM put the PageMail project on hold until a more suitable handheld device could be located or developed.

**Mr. Mahmood's Collaboration and Interactions with RIM**

43. In April 1995, while Mr. Mahmood was building his PageMail prototype, RIM was actively involved in RAM's Mobitex network, aggressively seeking potential customers to whom it could sell technology for use on the Mobitex network. *See* Exhibit 10, October 1995 RAM Product Catalog.

44. Accordingly, shortly after Mr. Mahmood's initial meetings with RAM, Mr. Philip introduced Don McMurtry, then RIM's Marketing Manager, to Mr. Mahmood and the PageMail project in order to open a dialogue about how RIM might be able to help Mr. Mahmood optimize PageMail for commercial sale.

45. Although Mr. Mahmood did not have a formal non-disclosure agreement in place at that time, he understood the relationship between RAM and RIM to be a

confidential one, and believed himself to be covered under that arrangement.

46. Further, Mr. Mahmood had a confidentiality agreement with RAM Mobile Data as to his work with RAM on PageMail. In that regard, Mr. Mahmood received documents from RAM marked "Commercial in Confidence."

47. Confidentiality agreements were also put in place in connection with RAM's approaching third parties, such as British Telecom and ST Mobile Data, about PageMail. *See*

48. Based on the collaborative and confidential relationship between RAM, RIM and Mr. Mahmood, and certain third parties, Mr. Mahmood's communications with RIM were confidential. In that regard, RIM sent a non-disclosure agreement to Mr. Mahmood, which he signed, and Mr. Mahmood sent RIM a non-disclosure agreement as well. *See* Exhibit 10, October 27, 1995 Email from Mr. McMurtry to Mr. Mahmood.

49. On or about April 26, 1995, Mr. Mahmood contacted Mr. McMurtry, inquiring about RIM's RAD-I/O software, as Mr. Mahmood understood that RAD-I/O provided a software interface to the InfoTAC. RIM's Don McMurtry responded to Mr. Mahmood's query on April 26, 1995. *See* Exhibit 11, April 26, 1995 Email from Mr. McMurtry to Mr. Mahmood.

50. Mr. Mahmood discussed his computer application, "cc:Mail 'Daemon'" with Mr. McMurtry, who said that it "sounds very exciting." *See* Exhibit 12, April 27, 1995 Email from Mr. McMurtry to Mr. Mahmood. Mr. McMurtry said that RIM would certainly like to look at the prototype of the daemon software. (*Id.*).

51. Upon information and belief, RIM's IT Director at the time, Wade Brown, received a copy of Mr. Mahmood's daemon software.

52. Because of Mr. McMurtry's interest in Mr. Mahmood's computer application, on May 1, 1995, Mr. Mahmood faxed RIM a detailed PageMail specification. *See* Exhibit 13, May 1, 1995 Fax from Synectics to Mr. McMurtry. With this and other communications, Mr. Mahmood explained in depth the details of PageMail's functions, its underlying operations, and the programming language so that Mr. McMurtry would have a very good understanding of the application. Based on Mr. Mahmood's explanations, Mr. McMurtry told Mr. Mahmood that RIM's RAD-I/O messaging could be used to translate signals to and from the Mobitex network into usable data for PageMail and the Motorola InfoTAC.

53. Among other things, the information that Mr. Mahmood provided to RIM included a complete description of Mr. Mahmood's PageMail inventions as disclosed in the PageMail Specification. *See* Exhibit 14, PageMail Specification, Revision 1.4.

54. Among other things, the PageMail Specification describes an example of *John* sending an email message to *Susan*, and a second portion showing *Susan* sending a reply message to *John* in a transparent manner using the same address as the one associated with the host system:

**Example**

For example, John sends an e-mail message to Susan which reads as follows:

```
To:             Susan
From:           John
Date:           17/5/95
Subject:        Meeting rescheduled
Message:        Hi Susan, the meeting with Acme Inc. at 3pm today has been
                changed to 2pm tomorrow because Frank is sick. Is this OK with
                you?
Receipt requested
```

Susan is using an InfoTAC and has asked that all message headers be sent to her automatically (AUTOSEND ON). She gets a message:

```
Subject:        Meeting Rescheduled
From:           John
Date:           17/5/95
Attach:         (none)
```

Susan needs more details regarding the meeting so she hits the RPLY button while the message from John is on the screen and chooses the command GET MESSAGE and sends the response. Moments later, Susan gets another message:

* * *

```
Subject:        Meeting Rescheduled
From:           John
Date:           17/5/95
Attach.         (none)
Message         Hi Susan. the meeting with Acme Inc  at 3pm today has been
                changed to 2pm tomorrow because Frank is sick. Is this OK with
                you?
Receipt requested
```

At this point, because Susan has read the message, the message is marked as being read in her in-box. Also, because the message had receipt request turned on, the gateway generates a message to John indicating that Susan has received the message via pager:

```
To:             John
From.           Susan
Date:           17/5/95
Subject:        Pager gateway delivery notification
Message:        Message received on pager at 10:45am 26-2-95:
                ---------------------------------------------
                Meeting rescheduled
```

Susan can make the meeting and needs to indicate this to John, so while the message is on the screen she presses the RPLY button and chooses and sends a response from any of the NON-COMMAND RESPONSES:

```
OK with me - schedule changed
```

The response is sent back to the gateway which matches the response with the original message from John and composes a reply which would look like this:

```
To:             John
From:           Susan
Date:           17/5/95
Subject:        Re: Meeting rescheduled
Message:        The following message has been generated by the
                recipient using PageMail two way paging over the
                RAM Mobile Data network:

                        OK with me - schedule changed

                ---------------- original message -----------
                Hi Susan. the meeting with Acme Inc. at 3pm today has been
                changed to 2pm tomorrow because Frank is sick. Is this OK with
                you?
```

John receives the message and knows that the meeting change is ok. In addition, the reply preamble tells John that Susan replied using a two-way pager, which is why her reply is so brief and does not include the usual niceties included in most mail messages. Any attachements that John had sent as part of the message would be stripped from the reply to reduce unnecessary repitition.

55. In the example above, *Susan* only needed one email address. By permitting the use of the same email address for the mobile device as the host system, PageMail solved what had come to be known as the "two mailbox problem."

56. The PageMail specification also describes the example of after "Susan has read the message, the message is marked as being read in her in-box."

57. The PageMail specification also describes that the exchange of emails between *Susan* and *John*, wherein "Susan is using an InfoTAC and has asked that all message headers be sent to her automatically (AUTOSEND ON)."

58. The PageMail specification also describes messages being sent from the mobile device, wherein "Susan can make the meeting and needs to indicate this to John, so while the message is on the screen she presses the REPLY button and chooses and sends a response from any of the NON-COMMAND RESPONSES: OK with me – schedule changed."

59. On May 3, 1995, Mr. McMurtry sent Mr. Mahmood an email telling him that he planned to speak with a RIM engineer about reviewing Mr. Mahmood's PageMail application. *See* Exhibit 15, May 3, 1995 email from Mr. McMurtry to Mr. Mahmood.

60. On information and belief, RIM received a copy of Mr. Mahmood's PageMail software application and RIM engineers reviewed that application.

61. In Mr. McMurtry's May 3, 1995 email, he also acknowledged that Mr. Mahmood's PageMail solved the "two mailbox problem," stating that "[h]aving a single mailbox which can be reached from anywhere is a powerful and exciting idea." More specifically, Mr. McMurtry's email to Mr. Mahmood states, in part, the following:

* * *

> The critical issue has always been the "two mailbox problem." The ideal solution is being able to have all of your internet and LAN-based mail coming into a single mailbox. When away from the office you simply retrieve the messages desired. This seems to be exactly what you have implemented.
>
> One year ago when we first introduced RAD-I/O we demonstrated three RAD-I/O interface programs (we call them "agents" or "RIOs"). One of the programs was for cc:Mail and one was for MS Mail and a third was for wireless fax. Our implementations were not designed to be commercial releases, just to be examples of what could be done with RAD-I/O. The problem was someone on the LAN was required to send a message to either "Tahir" or to "mobile_Tahir".
>
> The overall objective was to demonstrate that existing applications could quickly be created that were non-realtime interfaces to big-name applications – and clearly that was achieved. Your work makes a clear demonstration that the

> learning curve to Mobitex is very manageable. To build your application two years ago would have required at least 6 months and it would not be compatible with any other application.
>
> So . . . . . . . . to answer your question, MS Mail is the #1 LAN-based email package. There are millions of users. System administrators understand it, and are comfortable with the bridges and gateways that link it to the Internet. Having a single mailbox which can be reached from anywhere is a powerful and exciting idea. Yes MS Mail is important in our opinion.
>
> * * *

*See* Exhibit 12, Mr. McMurtry's May 3, 1995 email to Mr. Mahmood.

62. RAM helped coordinate Mr. Mahmood's work with RIM. For example, on or about May 10, 1995, Mr. Philip of RAM wrote to Mr. Mahmood saying "RIM are doing some good things, you should continue your dialog with Mr. McMurtry. See if he can send you the new rev of RAD-I/O with the RADLink documentation." *See* Exhibit 16, May 10, 1995 email from Mr. Philip to Mr. Mahmood. As a second example, on May 11, 1995, Mr. Philip wrote to both Mr. McMurtry and Mr. Mahmood, suggesting that Mr. Mahmood make a modification to PageMail, and send the modified version to both RAM and RIM. *See* Exhibit 17, May 11, 1995 email from Mr. Philip to Mr. McMurtry and Mr. Mahmood.

63. Mr. McMurtry contacted Mr. Mahmood to inform him that a new version of the RAD-I/O software was available and again encouraged Mr. Mahmood to incorporate it into PageMail. *See* Exhibit 18, May 10, 1995 Facsimile from Mr. McMurtry to Mr. Mahmood.

64. On information and belief, based on RIM's favorable opinion of PageMail, Mr. McMurtry took the initiative of introducing Mr. Mahmood to potential PageMail customers, such as ST Mobile Data, who like RAM, operated a Mobitex wireless network. *See* Exhibit 19, December 8, 1995 Facsimile from Mr. Tan of ST Mobile Data to Mr. Mahmood.

65. Among other things, Mr. Tan acknowledged the inventiveness of Mr. Mahmood's transparent mobile email solution: "Your description on how a pagemail server sitting at the ISP location could provide seamless internet access using the same id is most interesting." *Id.*

66. Upon information and belief, the interest that Mr. Tan expressed on behalf of ST Mobile Data in Mr. Mahmood's transparent push email solution along with the interest in PageMail that Mr. McMurtry had expressed, engendered excitement among Mr. McMurtry, Mihal Lazaridis, Gary Mousseau and other members of the RIM engineering team, and they began to see the tremendous commercial value of Mr. Mahmood's transparent push email solution when applied to a hand-held mobile device, as RIM's product development focus at that time had been directed to two-way paging technology.

67. In response to the outcome of the confidential focus-group, RAM put Mr. Mahmood's PageMail on hold until a more suitable handheld device could be found. As a result of RAM's decision, Mr. Mahmood reached out to Mr. McMurtry, to explain the results of the focus group, and that they needed to obtain a smaller device with a QWERTY keyboard.

68. In that regard, upon information and belief, Mr. McMurtry proposed circumventing the limitations of the InfoTAC device by using PageMail in conjunction with RIM's type 2 PCMCIA card in the HP OmniGo 100. Mr. McMurtry also informed Mr. Mahmood that RIM was working on the development of a pager device.

69. But on February 13, 1996, Mr. McMurtry sent Mr. Mahmood an email indicating that RIM had no interest in PageMail:

> Most of this stuff is driven by the networks themselves. RAM in the US is making a major move on the two-way paging

> market, and as you can see, RIM's focus is on supplying devices that are VERY viable for the intended users. RIM itself would not be the right channel for PageMail, however the networks, and their channels would be. I have passed your name to several network operators, beyond [ST Mobile Data] what is your activity?
>
> I feel that several networks will be interested in your product. The most immediate opportunities will be in the US, where two-way paging is being viewed as an important market and LAN-based e-mail connectivity will be part of that growth. Many of the US-companies working with RAM are focused on applications for specific vertical markets.

*See* Exhibit 20, Feb. 13, 1996 Email from Mr. McMurtry to Mr. Mahmood. As described in more detail below, Mr. McMurtry's statements, in particular that "RIM itself would not be the right channel for PageMail," proved to be false. By 1997, RIM had built an entire end-to-end system, ranging from mobile devices to "RIM's PageMail server" and even to desktop software like OutReach.

70. Thereafter, in April, 1996, Mr. Mahmood contacted Mr. McMurtry to again inquire as to whether RIM had a suitable handheld device for PageMail. Mr. McMurtry stated that RIM did not. Without an acceptable device, Mr. Mahmood believed and said that the PageMail project he had been working on with RIM in its then-current form was as good as dead.

71. But upon information and belief, as set forth below, RIM took Mr. Mahmood's mobile, transparent, push email solution for itself and began developing what would become the RIM 950 and the BlackBerry solution.

72. At the time of Mr. Mahmood's collaboration and interactions with RIM in 1995, RIM was a much smaller company than it is today, having approximately twenty-five employees.

73. RIM acknowledges that around the time Mr. Mahmood collaborated and interacted with RIM in 1995 in connection with PageMail, everyone at RIM "worked closely with one another and generally knew what everyone else was working on." *See* Exhibit 21, March 12, 2010 Declaration of Gary Mousseau, at 6.

74. On information and belief, given the level of interactions, communications, and cooperation between Mr. Mahmood and Mr. McMurtry regarding PageMail and the information exchanged between the two, McMurtry's senior position and responsibilities at RIM, and the small size of RIM at the time where everyone generally knew what everyone else was working on, others within RIM, including Mihal Lazaridis and Gary Mousseau, knew of PageMail, PageMail's specifications and operation, and considered and built upon what they knew in their development of wireless email software solutions, including the inventions claimed in the '694, '588, '464, and '457 patents, and related patent applications, including those identified in this Complaint.

**RIM Focused On Paging Technology In The Mid-1990s**

75. Upon information and belief, at the time RAM Mobile Data introduced Mr. Mahmood to Mr. McMurtry, RIM was focused on developing two-way paging technology.

76. Dave Castell, who was on the original BlackBerry marketing team, acknowledged that in the late 1990s RIM was largely focused on paging, with email as an afterthought. *See* Exhibit 22, "Memories of BlackBerry still vivid 10 years later" by Jason Santo.

77. As Alastair Sweeny explains in *Blackberry Planet*: "Fast forward to late 1990. The paging business took a giant evolutionary leap forward when RAM Mobile Data decided to issue a request for proposal (RFP) for a new two-way send-acknowledge

Mobitex pager, that would behave like the instant messaging (IM) we take for granted today. . . . Everybody was focusing on Mobitex as a simple paging network; nobody saw the great potential of Mobitex as the basis for a true handheld messenger with Personal Digital Assistant (PDA) features." *See* Exhibit 23, Excerpts of *BlackBerry Planet* by Alastair Sweeny, at 45.

78. Upon information and belief, "by the mid-1990s Lazaridis and his team were getting more and more frustrated doing wireless point-of-sale integration with another company's radios, so they started tinkering with building a RIM-only device." *See* Exhibit 23, at 56.

79. Upon information and belief, RIM's experience with Ericsson and RadioMail "got [RIM] into paging," and as Mr. Lazaridis explains, "we turned ourselves into experts in terms of the specifications of the paging network. We soon realized that, even though it was designed for one-way communication, you could incorporate a back channel so messages could go both ways." *See* Exhibit 23, at 56-67.

80. To that end, upon information and belief, "[i]n early 1996, RIM's engineers had pulled together a usable two-way flip-top Mobitex pager." *Id* at 60. "Lazaridis believed that his potential customers craved solutions in the way of small, user-friendly handhelds with a secure and reliable system of transmission—a technology that would keep everyone in the loop, no matter where they were or what access they had to standard computer servers. All of RIM's nearly one hundred employees were soon totally focused on getting their pager technology to market, and by the autumn of 1996, RIM was ready to show the 900 to the world." *Id.* at 60-61.

81. Upon information and belief, the paging device was introduced as the RIM

900 Inter@ctive Pager in September 1996, at the PCS tradeshow in San Francisco. *See id.* at 61. Upon information and belief, however, the RIM 900 Inter@ctive Pager was too heavy, bulky, and expensive to attract many mobile professionals. *See id.* at 61-62. Further, there were hardware glitches with the 900, and RIM ended-up selling only the contracted number of devices.

82. Upon information and belief, during the course of the development and launch of the 900, RIM began to appreciate the tremendous potential value of the hand-held mobile device that Mr. Mahmood had described and provided to RIM in the spring of 1995, specifically, Mr. Mahmood's mobile, transparent, push email solution that he built using Motorola's InfoTAC device, the transparent functionality of which Mr. McMurtry had praised and acknowledged as a "powerful and exciting idea" and Philip Tan of ST Mobile Data had also praised and communicated to RIM.

83. Upon information and belief, RIM also appreciated other aspects of Mr. Mahmood's PageMail, namely synchronizing information and actions from the mobile device back to the host system by providing a message status change indicator on a mobile device to be viewable on the host computer, for mirroring data items between a host system and a mobile device, and for replicating data items in real time between a host system and a mobile device.

**RIM's Patent Interference with Motorola Shows that Mr. Mahmood Invented the Mobile, Transparent, Push Email Solution Before RIM**

84. Motorola and RIM engaged in an interference proceeding involving the '694 patent and Motorola's patent application serial number 09/095,525 (the "Eggleston application").

85. Upon information and belief, Motorola established a priority date of

December 19, 1995. On information and belief, all that RIM and Mr. Lazaridis needed to prove was a conception date of the '694 patented inventions before December 19, 1995 to prevail in the interference.

86. Upon information and belief, during the course of the patent interference, RIM engaged in significant motion practice to defer disclosing its date of conception of the '694 claimed inventions.

87. Upon information and belief, the panel of Administrative Patent Law Judges found the document that RIM relied on in Mr. Lazaridis's priority statement to show the conception date of the '694 patented inventions, "does not precisely reveal 'wherein messages generated at either the mobile client [the email sender] or host system [service provider such as Hotmail.com] appear to originate at the message sender's first address.'" *See* Exhibit 24, USPTO Board of Patent Appeals and Interferences July 19, 2010 Memorandum Opinion, at 25.

88. Upon information and belief, RIM did not present evidence to the USPTO that it could predate the December 19, 1995 priority date of Motorola's Eggleston application, and shortly after the Patent Judges' order, RIM settled the patent interference with Motorola.

89. Upon information and belief, consistent with the fact that RIM did not present evidence to the USPTO that it could predate the December 19, 1995 priority date of Motorola's Eggleston application, RIM has acknowledged that it did not solve the "two-mailbox problem" until approximately 1998. Upon information and belief, RIM uses the term "two-mailbox problem" to refer to the limitation referred to in paragraph 87 of this Complaint. *See* Exhibit 22.

90. Mr. Mahmood, however, had communicated and collaborated with RIM on his mobile, transparent, push email inventions in the spring of 1995, well before December 19, 1995.

**U.S. Patent No. 7,386,588 B2**

91. On January 7, 2003, RIM filed Patent Application No. 10/240,960, which issued as the '588 patent, entitled "System and Method For Pushing Information From a Host System to a Mobile Data Communication Device." *See* Exhibit 1.

92. The '588 patent is a continuation-in-part of Application No. 09/087,623, which issued as the '694 patent.

93. Portions of the specification and figures from the '694 patent are also included in the '588 patent.

94. The '588 patent issued on June 10, 2008.

95. During the prosecution of the '588 patent, Gary P. Mousseau, Tabitha K. Ferguson, Barry Linkert, Raymond P. Vander Veen, William D. Castell, and Mihal Lazaridis each affirmatively represented to the United States Patent and Trademark Office ("Patent Office"), under penalty of oath, that they were the sole inventors of the subject matter disclosed and claimed in the application that issued as the '588 patent.

96. The '588 patent currently names Gary P. Mousseau, Tabitha K. Ferguson, Barry Linkert, Raymond P. Vander Veen, William D. Castell, and Mihal Lazaridis as inventors.

97. The current assignee of the '588 patent is RIM.

98. Upon information and belief, the '588 patent reads on all of RIM's systems for processing emails sent to and from RIM's BlackBerry devices.

99. RIM has at least one pending patent application, No. 11/926,383, and one issued patent, Patent No. 7,689,721, claiming priority to the application that issued as the '588 patent.

**The '588 Patent Reads Upon the PageMail Mobile Email Solution that Mr. Mahmood Conceived and Reduced to Practice and Was the Subject of His Communications, Interactions and Collaboration with RIM**

100. Claim 1 of the '588 patent recites the following:

> 1. A method of redirecting messages between a host system and a wireless mobile data device that is associated with a computer con[n]ected over a network to the messaging host system, the method comprising the steps of:
>
> receiving an automatically generated notification at a redirector component associated with the messaging host system indicating receipt of a mail item by the messaging host system, wherein the mail item is addressed to a data store associated with the messaging host system that is viewable via the computer;
>
> processing the mail item at the redirector component to add identification information associated with the wireless mobile data device;
>
> sending the mail item from the redirector component to add identification information associated with the wireless mobile data device;
>
> receiving from the wireless mobile data device at the redirector component information relating to a message status change of the mail item at the wireless mobile data device; and
>
> interfacing the information relating to the message status change of the mail at the wireless mobile data device to the messaging host system by the redirector component such that a message status change indicator is associated with the mail item and is viewable via the computer.

101. PageMail meets each limitation of at least the first claim of the '588 patent under at least a plain-meaning construction of the claim terms. PageMail provided a method of redirecting information between a messaging host system and a wireless mobile data device that is associated with a computer connected over a network to the messaging

host system.

102. The PageMail redirector component, which is associated with the messaging host system, received a notification indicating receipt of a mail item by the messaging host system, wherein the mail item was addressed to a data store associated with the messaging host system that was viewable via the computer.

103. PageMail processed the mail item at the redirector component to add identification information associated with the wireless mobile data device.

104. The redirector component of PageMail sent the mail item to the wireless mobile data device over a wireless network to the mobile data device.

105. PageMail received, from the wireless mobile data device, information relating to a message status change of the mail item at the wireless mobile data device.

106. PageMail interfaced the information relating to the message status change of the mail item at the wireless mobile data device to the messaging host system such that message status change indicator was associated with the mail item and was viewable on the computer.

107. Thus, at least claim 1 of the '588 patent reads on the PageMail mobile email solution that Mr. Mahmood conceived and reduced to practice, and which was the subject of his communications, interactions and collaboration with RIM.

**U.S. Patent No. 6,463,464 B1**

108. On March 17, 2000, RIM filed Patent Application No. 09/528,495, which issued as the '464 patent, entitled "System and Method for Replicating Information Between a Host System to a Mobile Communication Device Via a Wireless Network." *See* Exhibit 2.

109. The '464 patent is a division of Application No. 09/087,623, which issued as

the '694 patent.

110. Substantial portions of the specification and all the figures from the '694 patent are also included in the '464 patent.

111. The '464 patent issued on October 8, 2002.

112. During the prosecution of the '464 patent, Mihal Lazaridis and Gary P. Mousseau each affirmatively represented to the Patent Office, under penalty of oath, that they were the sole inventors of the subject matter disclosed and claimed in the application that issued as the '464 patent.

113. The '464 patent currently names Mihal Lazaridis and Gary P. Mousseau as inventors.

114. The current assignee of the '464 patent is RIM.

115. Upon information and belief, the '464 patent reads on all of RIM's systems for processing emails sent to and from RIM's BlackBerry devices.

116. RIM has at least one pending patent application, No. 10/207,418 claiming priority to the application that issued as the '464 patent.

**The '464 Patent Reads Upon the PageMail Mobile Email Solution that Mr. Mahmood Conceived and Reduced to Practice and Was the Subject of His Communications, Interactions and Collaboration with RIM**

117. Claim 1 of the '464 patent recites the following:

> 1. A method of replicating data items in real time between a host system and a mobile device, comprising the steps of:
>
> establishing a set of data items in both the host system and the mobile device to be replicated over a wireless network;
> configuring one or more replication events at the host system, wherein the one or more replication events include an internal event;
> detecting the occurrence of the one or more replication events;



75214438.1

in response to the occurrence of the one or more replication events, continuously replicating changes in the set of data items between the host system and the mobile device by immediately transmitting, in real-time, replication information between the host system and the mobile device via the wireless network, wherein the set of data items in the host system and mobile device is a set of email messages, and the replication information includes copies of the email messages;

receiving the copies of email messages at the mobile device;

generating reply messages at the mobile device to be sent to a plurality of message senders and transmitting the reply messages to the host system;

receiving the reply messages at the host system and configuring address information of the reply messages such that the reply messages use a first address associated with the host system as the originating address, wherein messages generated at either the host system or the mobile device share the first address; and

transmitting the reply messages from the host system to the plurality of message senders;

wherein the host system is an office computer system.

118. PageMail meets each limitation of at least the first claim of the '464 patent under at least a plain-meaning construction of the claim terms. PageMail provided a method of replicating data items in real time between a host system and a mobile device.

119. PageMail established a set of data items in the mobile device replicated from the host system over a wireless network. PageMail's "AutoSendOn" setting configured at least one redirection event at the host system. PageMail's "AutoSend" controlled a redirection event enabling it to send emails that were sent to a user at the user's host computer email address.

120. PageMail detected that redirection or replication event occurred at the host system and generated a redirection trigger.

121. In response to a redirection trigger, PageMail continuously directed messages from the host system to the mobile device, which were received by the mobile

device.

122. PageMail allowed messages to be generated at the mobile device to be sent to a plurality of message senders and transmitted them to the host system.

123. PageMail received the reply messages and configured address information for the reply messages such that the reply messaged used an address associated with the host system as the originating address, wherein the messages generated at either the host system or the mobile device shared the same address.

124. PageMail transmitted reply messages and operated as part of an office computer system.

125. Thus, at least claim 1 of the '464 patent reads on the PageMail mobile email solution that Mr. Mahmood conceived and reduced to practice, and which was the subject of his communications, interactions and collaboration with RIM.

**U.S. Patent No. 6,389,457 B2**

126. On February 13, 2001, RIM filed Patent Application No. 09/782,380, which issued as the '457 patent, entitled "System and Method For Pushing Information From a Host System to a Mobile Data Communication Device." *See* Exhibit 3.

127. The '457 patent is a continuation of Application No. 09/087,623, which issued as the '694 patent.

128. Substantial portions of the specification and all the figures from the '694 patent are also included in the '457 patent.

129. The '457 patent issued on May 14, 2002.

130. During the prosecution of the '457 patent, Mihal Lazaridis and Gary P. Mousseau each affirmatively represented to the Patent Office, under penalty of oath, that

they were the sole inventors of the subject matter disclosed and claimed in the application that issued as the '457 patent.

131. The '457 patent currently names Mihal Lazaridis and Gary P. Mousseau as inventors.

132. The current assignee of the '457 patent is RIM.

133. Upon information and belief, the '457 patent reads on all of RIM's systems for processing emails sent to and from RIM's BlackBerry devices.

134. RIM has at least one pending patent application, No. 11/925,833 claiming priority to the application that issued as the '457 patent.

**The '457 Patent Reads Upon the PageMail Mobile Email Solution that Mr. Mahmood Conceived and Reduced to Practice and Was the Subject of His Communications, Interactions and Collaboration with RIM**

135. Claim 1 of the '457 patent recites the following:

> 1. A method of mirroring data items between a host system and one or more mobile communication devices, wherein the host system is a desktop networked computer, comprising the steps of:
>
> receiving one or more incoming data items directed to a common address associated with a user account of the host system;
> storing at the host system in association with the user account the one or more incoming data items;
> copying the one or more incoming data items;
> sending the copies to a mobile communication device;
> receiving at the host system outgoing data items sent from the mobile communication device; and
> storing at the host system the data items sent from the mobile communication device, the host system causing the sent data items to be sent to the network;
> wherein data items generated at either the host system or the mobile communication device share the common address as the address from which the data items originated.

136. PageMail meets each limitation of at least the first claim of the '457 patent

under at least a plain-meaning construction of the claim terms. PageMail provided a method of mirroring data items between a host system and one or more a mobile communication devices, where the host system is a desktop networked computer.

137. PageMail received one or more incoming data items directed to a common address associated with a user account of the host system.

138. PageMail copied one or more incoming data items and sent messages from the host system to the mobile communication device.

139. PageMail received at the host system outgoing data items sent from the mobile communication device.

140. PageMail also stored at the host system data items sent from the mobile communication device, and the host system caused the sent data items to be sent to the network.

141. PageMail provided that data items or messages that were generated at either the host system or the mobile communication device shared the common address as the address from which the data items originated.

142. Thus, at least claim 1 of the '457 patent reads on the PageMail mobile email solution that Mr. Mahmood conceived and reduced to practice, and which was the subject of his communications, interactions and collaboration with RIM.

**U.S. Patent Application Publication No. 2008/0052365 A1**

143. On October 29, 2007, RIM filed Patent Application No. 11/926,283, which was published on February 28, 2008 as U.S. Patent Application Publication No. 2008/0052365 A1, entitled "System and Method For Pushing Information From a Host System to a Mobile Data Communication Device." *See* Exhibit 4.

144. The '365 publication is a continuation of Application No. 10/240,960, which became the '588 patent.

145. Portions of the specification and all the figures from the '694 patent are also included in the '365 publication application.

146. During the prosecution of the '365 publication, Gary P. Mousseau, Tabitha K. Ferguson, Barry Linkert, Raymond P. Vander Veen, William D. Castell, and Mihal Lazaridis each affirmatively represented to the Patent Office, under penalty of oath, that they were the sole inventors of the subject matter disclosed and claimed in the '365 publication.

147. The '365 publication currently names Gary P. Mousseau, Tabitha K. Ferguson, Barry Linkert, Raymond P. Vander Veen, William D. Castell, and Mihal Lazaridis as inventors.

148. The current assignee of the '365 publication is RIM.

149. Upon information and belief, the '365 publication reads on all of RIM's systems for processing emails sent to and from RIM's BlackBerry devices.

**The '365 Publication Reads Upon the PageMail Mobile Email Solution that Mr. Mahmood Conceived and Reduced to Practice and Was the Subject of His Communications, Interactions and Collaboration with RIM**

150. Claim 3 of the '365 publication recites the following as of January 31, 2012:

> 3. A method for processing a message addressed to a user having an address associated with a message server, the method comprising:
>
> detecting, by a redirector component, arrival of the message at the message server, the message requiring a read receipt requested by a sending party of the message and the message being displayable on the user's computer with a corresponding first message status icon viewable in an inbox of the user;
>
> causing to transmit at least a portion of the message to the user's mobile communication device over a wireless

network;

receiving a status signal from the mobile communication device and facilitating, responsive to the received status signal, altering of the first message status icon into a second message status icon to indicate that at least a portion of the message has been read; and

causing to transmit a read receipt signal to the sending party responsive to receiving the status signal from the mobile communication device.

151. PageMail meets each limitation of at least the third claim of the '365 publication under at least a plain-meaning construction of the claim terms. PageMail provided a method for processing a message addressed to a user having an address associated with a message server.

152. PageMail detected the arrival of messages displayable on the user's computer. The messages were displayable on the user's computer with a corresponding first message status icon viewable in an inbox of the user.

153. PageMail transmitted at least a portion of the message to the user's mobile communication device over a wireless network.

154. PageMail provided that if an email addressed to a mobile communication device user contained a read receipt, the mobile communication device would receive notice of the read receipt.

155. PageMail caused the email system to transmit a read receipt to the sending party response to receiving the status signal from the mobile communication device.

156. Thus, at least claim 3 of the '365 publication reads on the PageMail mobile email solution that Mr. Mahmood conceived and reduced to practice, and which was the subject of his communications, interactions and collaboration with RIM.

**U.S. Patent Application Publication No. 2008/0052409 A1**

157. On October 29, 2007, RIM filed Patent Application No. 11/926,394, which was published on February 28, 2008 as U.S. Patent Application Publication No. 2008/0052409 A1, entitled "System and Method For Pushing Information From a Host System to a Mobile Data Communication Device." *See* Exhibit 5.

158. The '409 publication is a continuation of Application No. 10/277,294, which is an abandoned divisional application related to the '694 patent.

159. Substantial portions of the specification and all the figures from the '694 patent are also included in the '409 publication.

160. During the prosecution of the '409 publication, Mihal Lazaridis and Gary P. Mousseau each affirmatively represented to the Patent Office, under penalty of oath, that they were the sole inventors of the subject matter disclosed and claimed in the '409 publication.

161. The '409 publication currently names Mihal Lazaridis and Gary P. Mousseau as inventors.

162. The current assignee of the '409 publication is RIM.

163. Upon information and belief, the '409 publication reads on all of RIM's systems for processing emails sent to and from RIM's BlackBerry devices.

**The '409 Publication Reads Upon the PageMail Mobile Email Solution that Mr. Mahmood Conceived and Reduced to Practice and Was the Subject of His Communications, Interactions and Collaboration with RIM**

164. Claim 3 of the '409 publication recites the following as of January 31, 2012:

> 3. A method of redirecting messages between a mail system and a mobile communication device, comprising:
>
> upon determining an occurrence of a trigger even that is configured to initiate redirection of message at the mail system with respect to the user, setting a redirection flag associated

> with the user; and
>
> upon detecting arrival of a new message at the mail system for the user, and determining that the redirection flag is set, pushing the new message to the mobile communication device associated with the user.

165. PageMail meets each limitation of at least the third claim of the '409 publication under at least a plain-meaning construction of the claim terms. PageMail provided a method of redirecting messages between a mail system and a mobile communication device.

166. PageMail defined trigger events that were configured to initiate redirection of messages at the mail system with respect to the user. PageMail also set a redirection flag associated with a user upon determining an occurrence of that trigger event.

167. PageMail, upon detecting the arrival of a new message at the mail system for the user, and determining that the redirection flag was set, pushed the new message to the mobile communication device associated with the user.

168. Thus, at least claim 3 of the '409 publication reads on the PageMail mobile email solution that Mr. Mahmood conceived and reduced to practice, and which was the subject of his communications, interactions and collaboration with RIM.

**RIM Co-Opted Mr. Mahmood's Inventions**

169. Upon information and belief, RIM co-opted Mr. Mahmood's inventions and began developing in approximately 1996-1997 what would become the RIM 950 and what would later be called the BlackBerry solution.

170. Upon information and belief, RIM first tried jury-rigging email by forwarding their work email inboxes to their RIM 950: "We discovered that we liked the experience of getting email to our belts. But we were unable to reply to the messages, since the 'from'

address was our desktop address and not the original sender. This messed up the reply path. Our IT Director, Wade Brown, was 'extremely concerned' about the security of forwarding all our communications outside the corporate firewall." *See* Exhibit 16, at 64.

171. Upon information and belief, RIM solved these problems by misappropriating Mr. Mahmood's mobile, transparent, push email solution, building it into the 950 and the BlackBerry solution, and patenting it themselves.

172. Upon information and belief, RIM also co-opted Mr. Mahmood's organizational solution in PageMail allowing for the synchronizing of information and actions from the mobile communication device back to the host system by providing a message status change indicator on a mobile communication device to be viewable on the computer, and patenting it themselves.

173. Upon information and belief, RIM also co-opted Mr. Mahmood's solution for mirroring data items between a host system and a mobile communication device and for replicating data items in real time between a host system and a mobile communication device.

174. RIM concealed the filing of the applications that led to the issuance of the '694, '588, '464, and '457 patents from Mr. Mahmood.

175. RIM also concealed the filing of the applications underlying the '365 and '409 publications from Mr. Mahmood.

176. Mr. Mahmood contacted RIM on February 18, 2004 and had subsequent communications with RIM in 2004. During these communications in 2004, RIM claimed to only have a "limited understanding" of PageMail. RIM also claimed that it developed the BlackBerry solution on its own without any input from PageMail. *See* Exhibit 25, RIM July

16, 2004 letter.

177. Documents that RIM submitted to the Patent Office, however, show that PageMail actually played a central role in RIM's BlackBerry solution. On or around December 12, 2001, during the prosecution of Patent Application No. 09/781,989, which became U.S. Patent No. 6,401,113 (issued on June 4, 2002), RIM's Mihal Lazaridis and Gary Mousseau submitted an Affidavit pursuant to 37 C.F.R. § 1.131 ("RIM's Section 131 Affidavit").

178. RIM's Section 131 Affidavit attached various documents, one of which includes the following figure that demonstrates that RIM was using an application it identified as "PageMail" in 1997:




*See* Exhibit 26, RIM's Section 131 Affidavit.

179. As shown in the above figure, the spelling and capitalization of RIM's "PageMail" is the same spelling and capitalization of Mr. Mahmood's PageMail.

180. Further, based on RIM's Section 131 Affidavit, at least two of the functions RIM ascribes to its "PageMail" are the same functions of Mr. Mahmood's PageMail.

181. One function that RIM's and Mr. Mahmood's PageMail shared is that both redirected emails sent to a user's host computer to a wireless communications device.

182. Another function that RIM's and Mr. Mahmood's PageMail shared is that both

received reply messages (generated at the mobile communications device) and then redirected those messages to the original email sender in a transparent fashion.

183. RIM's Section 131 Affidavit shows PageMail sitting in the path between users' desktop computers and their wireless devices demonstrating the necessary and central role PageMail played in RIM's 1997 communications system.

184. On or around July 30, 2001, during the prosecution of the application underlying the '464 patent at issue in this case, RIM also submitted documents containing the same references to "PageMail" in another affidavit pursuant to 37 C.F.R. § 1.131.

185. Upon information and belief, RIM has received and continues to receive payments, financial proceeds, and other commercial benefits and advantages resulting from Mr. Mahmood's conception and reduction to practice of the inventions disclosed and claimed in the '588, '464, and '457 patents and the '365 and '409 publications.

186. Mr. Mahmood has not received payments, financial proceeds, or other commercial benefits and advantages due him as result of his conception and reduction to practice of the inventions disclosed and claimed in the '588, '464, and '457 patents, and the '365 and '409 publications.

## CLAIMS

## COUNT I

## CORRECTION OF INVENTORSHIP PURSUANT 35 U.S.C. § 256

187. The allegations in paragraphs 1-186 are incorporated herein by reference.

188. Mr. Mahmood is at least an inventor, if not the sole inventor, of the subject matter disclosed and claimed in the '588, '464, and '457 patents, but he is not listed as an inventor on the '588, '464, and '457 patents.

189. RIM filed the applications for what would become the '588, '464, and '457 patents without disclosing to Mr. Mahmood that the applications would include subject matter that he conceived and reduced to practice.

190. As an inventor of the subject matter disclosed and claimed in the '588, '464, and '457 patents, Mr. Mahmood is an owner of the '588, '464, and '457 patents and an equitable titleholder to the '588, '464, and '457 patents.

191. The failure to list Mr. Mahmood as an inventor of the subject matter disclosed and claimed in the '588, '464, and '457 patents, was not a result of any action on the part of Mr. Mahmood.

192. The '588, '464, and '457 patents must be corrected pursuant to 35 U.S.C. § 256 to name Mr. Mahmood as an inventor.

**COUNT II**

**FRAUD**

193. The allegations in paragraphs 1-192 are incorporated herein by reference.

194. Mr. Mahmood shared his PageMail technology with RIM based on a confidential relationship. RIM had a duty to disclose to Mr. Mahmood that it intended to use his PageMail technology for its BlackBerry products and to patent his inventions.

195. In that regard, RIM acknowledged to Mr. Mahmood that his PageMail solved the "critical issue," namely the "two mailbox problem" and that PageMail embodied "a powerful and exciting idea."

196. But during Mr. Mahmood's collaboration with RIM in 1995-1996, RIM went on to falsely state that it had no interest in Mr. Mahmood's PageMail technology for its own devices, and "RIM itself would not be the right channel for PageMail."

197. RIM filed the applications for what would become the '588, '464, and '457 patents, the '365 publication, and the '409 publication without disclosing to Mr. Mahmood that the applications would include subject matter that he conceived and reduced to practice.

198. Mr. Mahmood never relinquished any of his rights to his PageMail technology to RIM.

199. Defendant RIM was aware on or about the time of the filing of the applications for the '588, '464, and '457 patents, the '365 publication, and the '409 publication, that Mr. Mahmood's PageMail technology had resulted, in whole or in part, in the patentable inventions that are the subject matter of the '588, '464, and '457 patents, the '365 publication, and the '409 publication.

200. RIM acted with the intent to deceive Mr. Mahmood and prevent him from acquiring ownership and the acknowledgment of inventorship of the inventions that are the subject matter of the '588, '464, and '457 patents, the '365 publication, and the '409 publication.

201. When Mr. Mahmood contacted RIM in 2004, RIM claimed it had only "limited" knowledge of PageMail and that it developed its BlackBerry solution on its own without any input from Mr. Mahmood or his PageMail. Indeed, RIM's own documents show that RIM's statements to Mr. Mahmood were false. RIM relied on a document referencing "PageMail" in its Section 131 Affidavit to obtain issuance of other patents, including the '464 patent.

202. Defendant RIM's actions demonstrate malicious, reckless, and/or willful disregard for Mr. Mahmood's legal and equitable rights.

203. Mr. Mahmood did not learn of the claims of the '588, '464, and '457 patents, the '365 publication, and the '409 publication until after 2010 when he retained U.S. counsel to represent him in the '694 action against RIM.

204. As a result of Defendant RIM's fraud, Mr. Mahmood has been denied inventorship and ownership of the inventions that are the subject matter of the '588, '464, and '457 patents, the '365 publication, and the '409 publication and has been damaged in an amount to be determined at trial.

**COUNT III**

**DECLARATION OF OWNERSHIP**

205. The allegations in paragraphs 1-204 are incorporated herein by reference.

206. An actual and justiciable controversy over the ownership and title of the '588, '464, and '457 patents, the '365 publication, and the '409 publication and the subject matter thereof has arisen and currently exists between RIM and Mr. Mahmood.

207. Mr. Mahmood will suffer harm if judicial consideration is withheld.

208. RIM claims to own the '588, '464, and '457 patents, the '365 publication, and the '409 publication, but RIM would not have been able to apply for these patents or prosecute the applications without the PageMail technology that Mr. Mahmood shared with RIM.

209. Mr. Mahmood did not learn of RIM's wrongful conduct and his rights in the '588, '464, and '457 patents, the '365 publication, and the '409 publication until after 2010 when he retained U.S. counsel to represent him in the '694 action against RIM.

210. Mr. Mahmood requests a judicial determination of his rights and a declaration that he is the true and proper owner of legal and equitable right, title, and

interest in the '588, '464, and '457 patents, the '365 publication, and the '409 publication.

## COUNT IV

## BREACH OF FIDUCIARY DUTY

211. The allegations in paragraphs 1-210 are incorporated herein by reference.

212. The collaborative relationship, Mr. Mahmood's trust in RIM, and mutual non-disclosure agreements gave rise to a fiduciary relationship between RIM and Mr. Mahmood.

213. Mr. Mahmood relied on RIM's superior expertise and knowledge.

214. RIM accepted a position of trust and confidence in its collaboration with Mr. Mahmood.

215. Because Mr. Mahmood trusted RIM, he shared detailed technical information regarding his PageMail technology with RIM.

216. RIM's Mr. McMurtry acknowledged that Mr. Mahmood's PageMail solved the "two mailbox problem" and praised Mr. Mahmood's PageMail by stating that "[h]aving a single mailbox which can be reached from anywhere is a powerful and exciting idea."

217. Mr. Mahmood trusted that RIM was being forthright and was acting in good faith during their interactions concerning the optimization and commercialization his PageMail technology.

218. RIM later told Mr. Mahmood that "RIM itself would not be the right channel for PageMail," but then co-opted Mr. Mahmood's PageMail technology and proceeded to file multiple patent applications that incorporated his technology. To this day, RIM continues to prosecute patent applications that contain Mr. Mahmood's technology for RIM's own benefit to the detriment of Mr. Mahmood.

219. Each breach by RIM was willful, intentional, deliberate and in bad faith.

220. Mr. Mahmood suffered and continues to suffer actual damages as a result of RIM's breach of its fiduciary duty.

**COUNT V**

**CONVERSION**

221. The allegations in paragraphs 1-220 are incorporated herein by reference.

222. Mr. Mahmood is the legal owner of the inventions that is subject matter of the '588, '464, and '457 patents, the '365 publication, and the '409 publication.

223. Mr. Mahmood has an immediate superior right of possession of the '588, '464, and '457 patents, the '365 publication, and the '409 publication.

224. Upon information and belief, Defendant RIM refuses to correct or assign the '588, '464, '457 patents, the '365 publication, and the '409 publication or the subject matter thereof to Mr. Mahmood.

225. Defendant RIM has exercised, and is continuing to exercise, an unauthorized dominion over the '588, '464, and '457 patents, the applications underlying the '365 and '409 publications to the exclusion of Mr. Mahmood's rights.

226. Defendant RIM has converted for its own use and advantage, the '588, '464, and '457 patents, the applications underlying the '365 and '409 publications and the subject matter thereof to the exclusion of Mr. Mahmood's rights.

227. Defendant RIM's actions demonstrate malicious, reckless, and/or willful disregard for Mr. Mahmood's rights.

228. Defendant RIM's conversion of the '588, '464, and '457 patents and the applications underlying the '365 and '409 publications and the subject matter thereof to the exclusion of Mr. Mahmood's rights has damaged Mr. Mahmood in an amount to be proven

at trial.

**COUNT VI**

**UNFAIR COMPETITION**

229. The allegations in paragraphs 1-228 are incorporated herein by reference.

230. Upon information and belief, Defendant RIM has made false and misleading representations in the marketplace regarding the inventorship of the '588, '464, and '457 patents and the applications underlying the '365 and '409 publications, and the origins of the patents and pending patent applications in its patent estate that relate to the '694 patent.

231. Defendant RIM never informed Mr. Mahmood that RIM would be filing patent applications that disclosed and claimed subject matter that he conceived of and reduced to practice.

232. Defendant RIM's false and misleading representations and omissions are acts of unfair competition and have resulted in loss of financial proceeds and/or commercial benefits and advantages to Mr. Mahmood.

233. Defendant RIM has also built a tremendously valuable and extensive patent estate based upon Mr. Mahmood's contributions to the parent application that issued as the '694 patent. The patent estate includes the '588, '464, and '457 patents and the applications underlying the '365 and '409 publications.

234. Building the patent estate to the exclusion of Mr. Mahmood is an act of unfair competition and an unfair trade practice. Defendant RIM continues to commit these acts in prosecuting related patents.

235. Without the contributions of Mr. Mahmood and his PageMail that were

shared in confidence with Defendant RIM, RIM could not have obtained the patent portfolio it possesses and is continuing to grow based on the application that issued as the '694 patent.

236. Defendant RIM's unlawful ownership of the '588, '464, and '457 patents and the applications underlying the '365 and '409 publications, and other patents and applications related to the '694 patent has resulted in the loss of financial proceeds and/or commercial benefits and advantages to Mr. Mahmood.

237. Defendant RIM's actions demonstrate malicious, reckless, and/or willful disregard for Mr. Mahmood's rights.

238. Defendant RIM's conduct constitutes unfair competition against Mr. Mahmood and this conduct has damaged Mr. Mahmood in an amount to be proven at trial.

**COUNT VII**

**UNJUST ENRICHMENT**

239. The allegations in paragraphs 1-238 are incorporated herein by reference.

240. Upon information and belief, Defendant RIM has been improperly enriched and continues to be improperly enriched by Mr. Mahmood's conception and reduction to practice of the inventions disclosed and claimed in the '588, '464, and '457 patents and the applications underlying the '365 and '409 publications by ownership of the '588, '464, and '457 patents and the applications underlying the '365 and '409 publications and by licensing the '588, '464, and '457 patents and the applications underlying the '365 and '409 publications in exchange for financial proceeds and/or other commercial benefits and advantages attendant or related to the ownership or licensing of the '588, '464, and '457 patents and the applications underlying the '365 and '409 publications.

241. Upon information and belief, Defendant RIM has also received benefits from being able to build a tremendously valuable and extensive patent estate based on Mr. Mahmood's contributions to the parent application that issued as the '694 patent. The patent estate includes the '588, '464, and '457 patents and the applications underlying the '365 and '409 publications.

242. Without the contributions of Mr. Mahmood, which included his Mail Daemon and PageMail technology that he shared in confidence with RIM, RIM could not have obtained a patent portfolio it possesses and is continuing to grow based on the application that issued as the '694 patent.

243. Upon information and belief, RIM has entered into agreements that include the patent portfolio based on the application that issued as the '694 patent, which include the '588, '464, and '457 patents and the applications underlying the '365 and '409 publications.

244. Defendant RIM's enrichment has been at Mr. Mahmood's expense, as he contributed his time, energy, and resources, but has not received any such financial proceeds and/or any other commercial benefits and advantages arising from his conception and reduction to practice of the inventions disclosed and claimed in the '588, '464, and '457 patents and the applications underlying the '365 and '409 publications.

245. Mr. Mahmood has also not received any financial proceeds and/or any other commercial benefits and advantages related to the patent portfolio that has resulted from the application for the '694 patent.

246. It would be unjust for Defendant RIM to retain the financial proceeds and other commercial benefits and advantages that were a result of Mr. Mahmood's time,

energy, resources, conception. and reduction to practice of the inventions disclosed and claimed in the '588, '464, and '457 patents and the applications underlying the '365 and '409 publications.

247. It would also be unjust for Defendant RIM to retain the financial proceeds and other commercial benefits and advantages relating to the '694 patent portfolio.

248. Defendant RIM's unjust enrichment, in an amount to be proven at trial, should be disgorged from RIM and awarded to Mr. Mahmood.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff Tahir Mahmood respectfully requests:

i. An order for correction of the '588, '464, and '457 patents and such other RIM patents that the Court may deem proper pursuant to 35 U.S.C. § 256 to name Mr. Mahmood as an inventor thereof;

ii. Permanent injunctive relief in the form of an Order requiring RIM to assign any patents and pending patent applications relating to or claiming priority to the applications underlying the '588, '464, and '457 patents that contain Mr. Mahmood's inventions;

iii. A declaration that Mr. Mahmood has been the legal and equitable owner of all right, title, and interest to the '588, '464, and '457 patents and the applications underlying the '365 and '409 publications and the subject matter thereof;

iv. Permanent injunctive relief in the form of an Order requiring RIM to include Mr. Mahmood in the prosecution of the applications underlying the '365 and '409 publications and not to prosecute those applications to the detriment of Mr. Mahmood's inventorship and ownership rights;

v. Permanent injunctive relief in the form of an Order requiring RIM to cease from the preparation and filing of any patent applications that disclose inventions that incorporate, were derived from, or relate to Mr. Mahmood's PageMail technology;

vi. Monetary damages in an amount to be determined at trial, together with pre-judgment and post-judgment interest on such damages;

vii. A disgorgement of profits related to Mr. Mahmood's inventions in an amount to be proven at trial;

viii. Restitution according to proof at the time of trial;

ix. A constructive trust in favor of Mr. Mahmood placing any profits or assets derived by RIM from its improper use of Mr. Mahmood's PageMail technology;

x. Punitive damages;

xi. Attorneys fees, costs, and interest; and

xii. Any and all other and further monetary or equitable relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff Tahir Mahmood demands a jury trial of all matters triable by a jury.

Dated: New York, New York

February 3, 2012

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

By: ______________________________

Ronald J. Schutz
Ronald M. Daignault
David Leichtman
601 Lexington Ave, Suite 3400
New York, New York 10022
(212) 980-7400
(212) 980-7499
rjschutz@rkmc.com
rmdaignault@rkmc.com
dleichtman@rkmc.com

*Attorneys for Plaintiff Tahir Mahmood*